**ABBOTT LABORATORIES,**
**Plaintiff–Appellee,**

v.

**UNILEVER UNITED STATES,**
**INC., Defendant–Appellant.**

**No. 94–3909.**

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 20, 1994.*

Decided Jan. 13, 1995.

* A prior appeal, No. 94–2215, was argued on November 2, 1994. It became clear during the oral argument that the district judge had not addressed the plaintiff's request for prejudgment interest. Later the district court entered a final judgment, including prejudgment interest in a stipulated amount. The appeal from this judgment has been submitted for decision on the basis of the original briefs and oral argument. Appeal No. 94–2215 is dismissed for want of jurisdiction. *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989).

James R. Daly (submitted), Robert C. Micheletto, Jones, Day, Reavis & Pogue, Chicago, IL, for plaintiff-appellee.

David L. Schiavone, Diane M. Mellett, Sonnenschein, Nath & Rosenthal, Chicago, IL, Kathy H. Chin, Terence F. Gilheany, Kathy H. McGuirk, Cadwalader, Wickersham & Taft, New York City, for defendant-appellant.

Before CUDAHY, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Sequoia Turner Corporation is engaged in medical research and the manufacture and sale of medical equipment. Unilever United States, Inc., owned all of Sequoia's stock until November 1991, when Unilever sold the stock to Abbott Laboratories. Abbott is a large manufacturer and distributor of medical supplies. One impetus behind the acquisition was that Abbott could achieve economies by using its established distribution channels to handle Sequoia's products. That meant displacing Sequoia's long-time distributor, E.I. du Pont de Nemours & Co., and the parties feared that DuPont would not go quietly. Abbott and Unilever accordingly made provision for the possibility of litigation, among other contingencies that might lead to an adjustment of the price after Abbott had assumed control.

Sections 9.3 and 9.5(b) of the parties' contract provide the rules for the handling of claims after the transfer of ownership. The pertinent language of § 9.3 reads (all underlining in the original):

Distributor Losses. Notwithstanding anything to the contrary contained in Section 9.1 or 9.2, Seller [Unilever] and Buyer [Abbott] jointly shall share all Losses which may arise out of or in any way relate to any actual or alleged relationship whether pursuant to contract or other agreement

related to the Business ("Distributor Losses"), between the Company [Sequoia] and either of (i) Infolab, Inc. ("Infolab") and (ii) E.I. du Pont de Nemours & Company or any of its subsidiaries or Affiliates (any of such entities being hereinafter referred to as "DuPont") in accordance with the following allocation. The first $1,000,000 of Distributor Losses shall be shared on an equal basis by Buyer and Seller up to such $1,000,000, the next $1,333,333.33 of Distributor Losses shall be shared by Buyer and Seller on a basis of 25% by Buyer and 75% by Seller (on a dollar-for-dollar basis) and the next $666,666.67 of Distributor Losses shall be solely the responsibility of Buyer. Thereafter each of Buyer and Seller will each be responsible for its own Distributor Losses (including all related legal costs) in excess of such $3,000,000, and for any Distributor Losses neither Seller nor Buyer shall have any responsibility to the other in excess of such $3,000,000, other than with respect to mutual cooperation. . . .

Notwithstanding anything to the contrary contained in Sections 9.4 and 9.5, Buyer shall direct and manage any and all litigation related to Infolab and DuPont using a law firm selected by Buyer (provided that Seller has consented to the use of such law firm, which consent will not be unreasonably withheld). Such law firm will act on behalf of both Buyer and Seller, provided that Buyer will direct such law firm with respect to any such litigation. Buyer shall keep Seller fully advised and consult with Seller with respect to any major litigation decisions, however, Buyer shall retain the sole right to direct and manage such litigation. In the event of any Distributor Losses in excess of $3,000,000, each of Buyer and Seller shall be responsible for its own Losses and litigation decisions related to Infolab and DuPont.

Section 9.5(b), part of a provision captioned "Defense of Third Party Claims", reads:

Except as otherwise provided in Section 9.3, Seller has the right, at its own expense, to participate in the defense of all actions, claims, suits or cases assumed by Buyer pursuant to this Agreement or which arise subsequent to the Closing involving pre-Closing activities of the Company. Without the written consent of Seller, which consent will not be unreasonably withheld, Buyer may not settle any such action, claim, suit or case. In the event Seller does not consent to a settlement, Seller will assume the defense of such action, claim, suit or case for its own account whereby Buyer shall be released from any further liability with respect to such action, claim, suit or case. Seller may, at any time and at its sole discretion, decide to assume the defense of such action, claim, suit or case for its own account whereby Buyer shall be released from any further liability with respect to such action, claim, suit or case.

The contract provides for interpretation and enforcement under New York law.

After the transaction closed Sequoia told DuPont that Abbott would become its distributor. DuPont filed suit in California, Sequoia's home state, seeking an injunction against the change. Abbott hired a law firm to defend the litigation; Unilever approved the choice. In May 1992 the state court denied DuPont's motion for a preliminary injunction. After some months of negotiations, DuPont agreed to dismiss its suit—thus abandoning its claim for damages and a permanent injunction—in exchange for $3 million in cash plus a promise to buy back inventory worth $500,000. Abbott notified Unilever of this development in September 1992, after the parties had agreed on terms but before they signed the definitive agreement. Unilever expressed surprise at the size of this payment, believing that DuPont's claim was not worth so much in light of the order denying preliminary relief. Unilever declined to approve or join the settlement; Sequoia, Abbott, and DuPont (the only parties to the litigation) closed the settlement in November 1992. When Unilever refused to pay its $1.5 million share (computed using the formula in § 9.3), Abbott sued under the diversity jurisdiction, and the district court granted summary judgment in Abbott's favor. 1994 WL 148666, 1994 U.S. Dist. Lexis 5218.

Unilever's principal argument is that § 9.3, which gives Abbott "the sole right to direct and manage" the DuPont litigation, does not permit it to "settle" the litigation. All settlements are governed by § 9.5, Unilever insists, which obliged Abbott to obtain Unilever's approval. Unilever does not contend that any distinctive principles of New York law require this interpretation or that usages of trade illuminate ambiguous terms. New York gives primacy to the text of a contract, *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100 (1985); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282 (1961), and Unilever relies entirely on the text. We therefore approach the dispute, as did the district court, by asking what the words in the contract would have meant to reasonable persons in the parties' position, sharing the objectives Abbott and Unilever had at the time. See *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (New York law). Cf. *Bristow v. Drake Street Inc.*, 41 F.3d 345, 350–52 (7th Cir.1994).

■ The contract refutes Unilever's position. Section 9.5(b), which contains the provision giving it authority to disapprove settlements (and to assume the defense for its own account), does not apply to the DuPont litigation. It begins: "Except as otherwise provided in Section 9.3". Section 9.3 mirrors this exclusion, providing that "[n]otwithstanding anything to the contrary contained in Sections 9.4 and 9.5, Buyer shall direct and manage any and all litigation related to Infolab and DuPont". It would be vain to treat the "except" clause in § 9.5(b) as limited to the first sentence of that subsection (Unilever's preferred reading), given that § 9.3 excludes all of § 9.5. And the contrast between the sweeping powers of § 9.3 and the limited powers of § 9.5(b) shows that "direct and manage" includes the power to settle. Section 9.5(b) demonstrates that the parties recognized settlement as a distinct option, yet § 9.3 gives Abbott full directorial power without a settlement reservation.

The interlocking exclusions ensure Abbott full control of the DuPont litigation for a compelling reason. DuPont sought an injunction, as the parties surely anticipated it would. The risk of an injunction exposed Sequoia and Abbott to future losses that would be hard to quantify. Giving Unilever the power to disapprove a settlement—and to assume the defense itself—would permit it to visit these potentially considerable costs on Abbott at no risk. Imagine what would have happened if Unilever had rejected the settlement and taken over the defense under § 9.5, then settled the case itself by consenting to the entry of the injunction DuPont sought. Such a maneuver would have protected Unilever's treasury at great cost to Abbott. It is unlikely that parties to a transaction such as this would have given the seller so much power to affect the buyer's fortunes.

Instead of putting Abbott at Unilever's mercy, the contract required the two firms to share the risks and losses through the formula contained in § 9.3. Unilever protests that § 9.5 was designed to prevent Abbott from spending Unilever's money too freely. But consider the structure of the provision: if § 9.3 controls, then everything exceeding $2,333,333.33 comes exclusively from Abbott's pocket, giving it an incentive to be thrifty; and Abbott can't spend any of Unilever's money without spending some of its own (a 50–50 match in one range and a 25–75 match in another). By agreeing to pay DuPont $3 million, Abbott undertook to pay 100% of the final $666,666.67 (plus any difference between $500,000 and the value of DuPont's inventory). It is unlikely that it would have spent 100¢ on the dollar in this range if it did not believe the litigation risk substantial. Unilever also had a right of approval over the selection of the law firm that would assess the litigation's risks. Devices tending to align the interests of the parties are common palliatives to the problem that no one is a perfect agent of another, and reading § 9.3 as an interest-alignment provision is much more plausible than treating § 9.5 as giving Unilever unbridled authority to reject a settlement and thus impose costs on Abbott at little risk to itself.

■ To conclude that § 9.3 governs is not necessarily to decide in Abbott's favor, however. Section 9.3 requires "Buyer [to] keep

Seller fully advised and consult with Seller with respect to any major litigation decisions". Between May 1992, when the state court denied DuPont's motion for a preliminary injunction, and September 1992, when Abbott told Unilever that it had a settlement in the works, there was no communication between the parties. It is hard to see how silence, broken only by the announcement of a settlement, satisfies a promise to keep Unilever "fully advised and consult with [Unilever] with respect to any major litigation decisions". Announcing that a settlement has been reached is some distance from consulting on the question whether a settlement is appropriate, and if so on what terms.

The district judge assumed that Abbott had failed to consult as required, but he deemed that neglect immaterial in light of Abbott's power to settle on its own terms. Unilever replies, rightly we think, that this is equivalent to excising the consultation clause from the contract. Consultation could have served an independent function. Unilever might have had information about the Sequoia–DuPont distributorship arrangements that would have helped Abbott chisel down the price (or firm up a backbone to resist the suit on the merits); such information would have been much more influential if used during negotiations than if presented to DuPont after a bargain had been reached. Unilever's in-house counsel also might have been able to offer information about California law that could have affected the course of negotiations and the terms of the bargain. With $1.5 million at stake, Unilever understandably wanted an opportunity to make its views known, and to drive down the price if it could, rather than to be presented with a *fait accompli*.

Although consultation *could* have served an independent function, nothing in the record of this case suggests that it *would* have served such a function. Unilever has not argued that it possessed factual or legal information that would have been useful in the negotiations, or would have induced Abbott to fortify its resolve and proceed to trial. Recall that the final two thirds of a million dollars came entirely from Abbott; that the marginal payment was Abbott's suggests that it negotiated as vigorously as it could. Unilever has not suggested that, if brought into the negotiations, it would have taken an active role. After reaching a tentative bargain with DuPont, Abbott asked Unilever—hypothetically, given the agency cost problems we discussed above—whether if § 9.5 applied Unilever would disapprove the settlement and assume the defense at its own risk. Unilever did not reply. At oral argument, Unilever was unable to identify any contribution it could have made to the negotiations, even with the benefit of hindsight and a full record. It follows that Abbott's failure to keep its promise was harmless, and that the omission does not excuse Unilever from paying its share of the price.

One final issue remains. The district court ordered Unilever to pay the legal expenses Abbott has incurred in this litigation, observing that attorneys' fees count as "Losses" (a term defined by the contract) and are reimbursable under § 9.1. Unilever replies that it agreed to indemnify only "Losses" exceeding $100,000, and that Abbott's legal costs in this litigation did not approach that sum. True enough, the *legal fees* did not exceed $100,000. But the agreement provides that Abbott is "entitled to indemnification hereunder ... when the *aggregate* of all Losses" exceeds $100,000 (emphasis added). The contract includes as a loss compensable under § 9.1 the value of "any breach or violation of this Agreement by Seller." By refusing to pay the $1.5 million due under § 9.3, Unilever broke its promise. The $1.5 million thus became a loss covered by § 9.1. As this loss exceeded $100,000, attorneys' fees were properly tacked on without a need to satisfy a second $100,000 threshold.

AFFIRMED.